# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| KANDAS DISMUKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 2:11-CV-409-CSC |
| | ) | (WO) |
| J&R ENTERTAINMENT, LLC , *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Now pending before the court is the motion for attorney fees filed by the Plaintiff, Kandas Dismukes. (Doc. 35). Also pending before the court is Dismukes's motion for compensatory and punitive damages. (Doc. 36). Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to a United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment. (Docs. 17 & 18). Having considered the motions, and for good cause, the court concludes that the motions are due to be granted.

### Facts

Plaintiff Kandas Dismukes filed this action alleging that her former employer discriminated and retaliated against her and constructively terminated her employment in violation of 42 U.S.C. § 1981. Specifically, Dismukes alleged that Defendants J&R Entertainment and Robyn Prickett[1] discriminated against her, harassed her, subjected her to

---

[1] The complaint names this defendant as "Robin Pickett." However, it is clear from the case file, particularly from the filings submitted by Prickett's former attorneys on her behalf, that her name is in fact

a hostile working environment, and constructively discharged her because she opposed her employer's racially discriminatory policies and also because she, a white woman, was engaged to a man of mixed race and openly associated with people of other races. (Doc. 1).

After Defendants J&R Entertainment and Robyn Prickett abandoned the defense of this action, Dismukes moved for entry of default and for default judgment. On July 13, 2012, this court entered an order (Doc. 28) granting Dismukes's motion for default and for default judgment. As the court noted in its July 13, 2012, order, the entry of default causes all well-pleaded allegations of facts to be deemed admitted. *See Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987). Because those facts are set forth in detail in the complaint and in the court's July 13, 2012 order (Doc. 28), the court will not repeat them again here. Additionally, on August 23, 2012, Dismukes provided testimony at a hearing to determine damages. (Doc. 31). Dismukes's testimony was credible and fully consistent with the allegations of the complaint.

## Discussion

**A.     Compensatory Damages**

Dismukes seeks compensatory damages for out-of-pocket costs, emotional distress, and pain and suffering. "As a general rule, general compensatory damages, as opposed to special damages, need not be proven with a high degree of specificity. Compensatory damages 'may be inferred from the circumstances as well as proved by the testimony.'"

---

"Robyn Prickett." See Docs. 9, 18, & 23.

*Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005) (quoting *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999)). "As a matter of both common sense and case law, emotional distress is a predictable, and thus foreseeable, consequence of discrimination." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1199 (11th Cir. 2007). Therefore, a civil rights "plaintiff may be compensated for intangible, psychological injuries as well as financial, property, or physical harms." *Akouri*, 408 F.3d at 1345 (citing *Marable v. Walker*, 704 F.2d 1219, 1220–21 (11th Cir.1983) (holding that the plaintiff's own testimony that he was embarrassed and humiliated by the defendant's discriminatory conduct was sufficient to support a compensatory damages award)); *see also Ferrill,* 168 F.3d at 476 (holding that a plaintiff may recover for emotional harm under § 1981). In the case of emotional injury resulting from a constitutional violation, damages for mental anguish are not presumed, but may be awarded when the plaintiff presents competent, sufficient evidence of "demonstrable" emotional injury, which is "customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F. 3d at 1345 (citing *Carey v. Piphus*, 435 U.S. 247, 263-64 (1978)).

At the August 23, 2012 hearing in this case, Dismukes testified about the mental and emotional anguish Robyn Prickett and J&R Entertainment caused her by their discriminatory actions. Robyn Prickett is part-owner and manager of J&R Entertainment, which does business as Dooley's Pub. (Doc. 1 ¶¶ 4-5). In January 2010, Prickett hired Dismukes to work as a bartender and manager-on-duty at Dooley's Pub. As early as the first night

Dismukes reported to work at Dooley's Pub, Robyn Prickett and the other employees at Dooley's Pub began to belittle, avoid, and criticize her because she had black friends and a mixed-race fiancé, and because she did not cooperate with the pub's policies that were intended to deter black customers from frequenting the establishment.  Prickett made clear to Dismukes that she was "not respected as the manager on duty" by the other employees at Dooley's because she was a "nigger lover." (Doc. 1; hearing testimony).  Thereafter, Prickett berated Dismukes, and Dismukes was made to feel as though she was being "forced out" because of her opposition to discrimination and because of the racial identity of the man she had chosen to marry.   (Doc. 1; hearing testimony). Dismukes responded to the hostility in the workplace by working harder and doing even more than was required of her, and by "apologizing for everything."  (Hearing testimony).  Her hard work and apologies did not earn the respect of her boss and coworkers or alleviate the hostility she faced in the workplace.  (Hearing testimony).  Prickett told Dismukes that, even though she was the hardest working employee at the bar, she was "ruining the business" because of her association with people of other races.  (Hearing testimony).  Prickett also issued a veiled physical threat as a supposed excuse for her treatment of Dismukes: she told Dismukes that she thought Dismukes was "not safe" and that she "could not control" Dooley's customers should they take issue with Dismukes's association with people of other races.  (Hearing testimony).

      When Dismukes began to work for Dooley's bar, she had a great deal of personal

confidence, partly based on her belief in the intrinsic value of hard work and treating all people "like human beings" regardless of their race. (Hearing testimony). However, as a result of the insults, hostility, and threats in the workplace, Dismukes's former confidence gave way to sadness, humiliation, sleeplessness, depression, and a feeling that she was "not equal to others." (Hearing testimony). Dismukes's sleeplessness and depression grew so severe that she sought medical treatment, and she took prescription medications as part of that treatment. (Hearing testimony). As a result of the discriminatory treatment, Dismukes still feels depressed, embarrassed, and sad, and she has not regained her former sense of confidence. (Hearing testimony). The court observed Dismukes's genuine distress on the stand, and the court finds Dismukes's testimony about her continuing, extensive emotional anguish to be credible. *See Ferrill*, 168 F.3d 468, 476 (11th Cir. 1999) (holding that "[h]umiliation and insult are recognized, recoverable harms" in § 1981 cases). *Cf. DeCorte v. Jordan*, 497 F.3d 433, 442-43 (5th Cir. 2007) (affirming an award of compensatory damages to former employees in a race discrimination action under § 1981 and Title VII, where each employee testified about the personal difficulties experienced after being terminated, including stress, sleeplessness, strained relationships with family members, depression, and loss of self-confidence).

When Dismukes went to work for Dooley's in January 2010, Dismukes often socialized publicly with her then-fiancé (now husband) without fear or embarrassment. After Dismukes was threatened and humiliated in the workplace, including being told by Robin

5

Prickett that she was "not safe" from the reactions of others, she was embarrassed and afraid for members of the general public to find out about her relationship with her fiancé. Therefore, for a time, Dismukes avoided being seen with him or showing affection for him in public. It is clear from Dismukes's testimony, as well as her demeanor on the stand, that the discriminatory treatment directed at Dismukes's relationship with her fiancé/husband[2] has significantly contributed to Dismukes's emotional distress and suffering. *Cf. Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir. 1985) (holding that compensatory damages for emotional pain and suffering were supported in a §1981 cases where "[t]he district court . . . received testimony that the plaintiff suffered emotional stress, loss of sleep, marital strain and humiliation because of violation of his civil rights").

Further, as a single mother with two children to support, Dismukes suffered a great deal of mental and emotional anguish due to the financial strain she endured when Prickett reduced her shifts to one or two nights per week because of her interracial associations and her opposition to the pub's discriminatory policies. When Dismukes told Robyn Prickett she needed more work and that she and her children could not live off the meager income from her drastically reduced work schedule, Prickett responded with indifference, broken promises to call if additional shifts opened up, lying to Dismukes about the availability of shifts, and hiring someone else to work Dismukes's former shifts without offering those shifts to Dismukes. (Doc. 1; hearing testimony). Rather than capitulate to Prickett's demands that

---

[2]Dismukes's husband attended the August 23, 2012 hearing in this case but did not testify.

she participate the discriminatory practices at Dooley's bar and stop associating with people of other races, Dismukes chose to provide for herself and her children by finding a second, lower-paying job at another bar. (Doc. 1; hearing testimony). Despite the hostile environment she suffered at Dooley's, Dismukes made sure her second job would not interfere with her responsibilities at Dooley's or place her second employer in competition for Dooley's customers. (Doc. 1; hearing testimony). When Prickett discovered Dismukes had obtained other employment, she demanded that Dismukes "choose" between working one night a week at Dooley's, and working at the second job, which did not pay as much as a full work schedule at Dooley's would have paid. (Doc. 1; hearing testimony). Embarrassed, humiliated, emotionally fatigued, and financially strapped, Dismukes quit her job at Dooley's and continued to work at the second job. *Cf. Bogle v. McClure*, 332 F.3d 1347, 1354, 1359 (11th Cir. 2003) (affirming award of emotional damages for race discrimination, where plaintiffs testified to having felt "embarrassed, humiliated, stunned, confused, angry, frightened, discouraged, and betrayed," with one testifying, "I can't begin to tell you what a toll it has taken on me. To be an active and producing person and then to suddenly be just put on the shelf and made to sit there through no purpose of my own or no doing of my own, I could not help that I was hurt").

Prior to having most of her shifts eliminated and then leaving Dooley's for a lower paying job, Dismukes had worked hard to successfully maintain a good credit record. Because of Dismukes's financial losses from weeks of working reduced hours, because she

was required to "choose" to quit her job at Dooley's Pub, and because she did not earn as much at the second job as she would have at Dooley's, she fell behind on her bills, lost her previously good credit record, and ultimately had to declare bankruptcy.  The loss of Dismukes's good credit and the declaration of bankruptcy further humiliated Dismukes and subjected her to further financial strain.  *See Akouri*, 408 F.3d at 1344 ("[A] plaintiff may be compensated for intangible, psychological injuries," including humiliation, "as well as financial, property, or physical harms").

Accordingly, having considered all the facts and evidence, including Dismukes's demeanor on the witness stand, the court concludes that an award of $35,000.00 in damages is fully justified to compensate Dismukes for her mental, emotional, and pecuniary damages (other than front pay and back pay).

**B.     Front Pay and Back Pay**

In her complaint, Dismukes sought an award of front pay and back pay. (Doc. 1 ¶ p. 12).  However, Dismukes has since notified the court in writing that she has decided to withdraw her request for an award of front pay and back pay. (Doc. 33).  Therefore, back pay and front pay will not be awarded.

**C.     Punitive Damages**

**1.     Dismukes has stated a claim upon which punitive damages may be awarded.**

Punitive damages are available under 42 U.S.C. §§ 1981 'when the defendant's conduct is shown to be motivated by actual malice, or when it involves reckless indifference

to the federally protected rights of others. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F. 3d 1261, 1280 (2008); *Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir. 1985) (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)).  "Malice" means an "intent to harm" and "recklessness" is "serious disregard for the consequences of one's actions." *Goldsmith*, 513 F. 3d at 1280. "'Malice or reckless indifference is established by a showing that the employer discriminated in the face of knowledge that its actions would violate federal law.'" *Id*. (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002).  Examples of conduct that support a punitive damages award include "'(1) a pattern of discrimination; (2) spite or malevolence; or (3) a blatant disregard for civil obligations.'" *Id*. (quoting *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1322-23 (11th Cir. 1999)).

   The evidence in this case clearly establishes that Prickett and J&R Entertainment acted with both actual malice and reckless indifference to Dismukes's civil rights.  Prickett deliberately threatened, embarrassed, and humiliated Dismukes, and purposefully cut Dismukes's hours to reduce her income.  (Doc. 1; hearing testimony).  When Dismukes confronted the establishment's pattern of mistreating black customers or when she complained about the suffering Prickett was causing her simply because she was a white woman who associated with people of other races, Prickett intentionally responded with further ill treatment.  Prickett acted with extreme hostility even though she was aware that her verbal threats and derogatory comments greatly upset Dismukes (*e.g., see* Doc. 1 ¶ 30). Prickett told Dismukes that her shifts were cut because "everybody had to give up shifts,"

9

but this was a blatant lie. (Doc. 1; hearing testimony). When Dismukes asked for more shifts and told Prickett that she was suffering financially and was having difficulty providing for her children because her shifts were cut, Prickett still deliberately chose to give Dismukes's shifts to other employees who did not associate with black people. (Doc. 1; hearing testimony). Prickett also refused to call Dismukes on the night of a busy Fat Tuesday party even though she needed additional help with the bar that night, and even though she had promised to call if she needed additional help. (*See* Doc. 1 ¶ 35). Even before Dismukes was forced to "choose" between her meager shift at Dooley's Pub and another, lower-paying job that offered more shifts, Prickett had already hired additional staff to replace Dismukes. Therefore, based on these facts and the record as a whole, the court concludes that Prickett had absolutely no regard for the emotional and financial suffering that she knew she was causing Dismukes, and, in fact, she fully intended to cause the harm. *See Goldsmith*, 513 F. 3d at 1280 (defining "malice" and "reckless indifference").

Further, the facts establish that Prickett knew her actions violated Dismukes's civil rights. *Goldsmith*, 513 F. 3d at 1280 (holding that punitive damages are available under § 1981 where the employer "discriminate[s] in the face of a perceived risk that its actions will violate federal law"). When confronting Prickett about her treatment of Dismukes, Dismukes's fiancé specifically informed her that "[t]his is 2010, not the 50's where shit [sic] was segregated" (Doc. 1 ¶ 28) – a fact that, even in Alabama, is a matter of general knowledge. In addition, from Prickett's pattern of intentional hostility and lies toward

Dismukes, and from her intentional scheduling of Dismukes's shifts so that Dismukes ultimately could not afford to work at Dooley's Pub, the court concludes that Prickett must have perceived that she could not simply fire Dismukes because she did not like her choice of a fiancé, her association with people of other races, her opposition to the pub's discriminatory practices, or her willingness to serve paying customers regardless of their race. Accordingly, the court concludes that Dismukes is entitled to an award of punitive damages against Prickett. *See Goldsmith*, 513 F. 3d at 1280 (holding that punitive damages are appropriate in cases involving "(1) a pattern of discrimination; (2) spite or malevolence; *or* (3) a blatant disregard for civil obligations." (Emphasis added)).

Punitive damages are also available under § 1981 against the employing entity where "the discriminating employee was high up in the corporate hierarchy or . . . higher management countenanced or approved [her] behavior." *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 900-01 (11th Cir. 2011). J&R Entertainment is a small business of which Prickett is one of only two owners;[3] there is no "corporate heirarchy" higher than Robyn Prickett. Based on this record, Prickett was the person with the final authority over all relevant matters in this case. In other words, Prickett *was* "higher management," and she masterminded and fully participated in the discriminatory treatment of Dismukes. Therefore, Dismukes is entitled to punitive damages against J&R Entertainment, Inc.

---

[3] The court notes that the other owner of the business, who has been dismissed from the case, has acknowledged that he "was not a supervisor to [Dismukes], nor was he involved in her employment at Dooley's Pub in any way." Doc. 13 p ¶ 10.

11

**B.     Amount of punitive damages.**

In determining the amount of punitive damages that are appropriate in this case, this court has carefully considered the facts of this case in light of the need for deterrence, *see Goldsmith*, 513 F.3d at 1284, and in light of the relevant factors which, by law, must be considered in evaluating an award of punitive damages. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *see also Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)[4] ("There must be a sufficient basis in the pleadings for the [default] judgment entered."). "The dominant consideration in the evaluation of a punitive damages award is the reprehensibility of the defendant's conduct." *Goldsmith*, 513 F.3d at 1283 (citing *Gore*, 517 U.S. at 575). In evaluating the reprehensibility of the Defendants' conduct, the court has considered several issues:

> "(1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Goldsmith*, 513 F.3d at 1283 (citing *Gore*, 517 U.S. at 575).

In this case, the conduct of the Defendants was particularly reprehensible because the harm suffered by Dismukes was not purely economic, the Defendants knew Dismukes was financially vulnerable, the racially offensive comments and conduct were not isolated, and

---

[4]See *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

the emotional and financial harm Dismukes suffered was the fully intended result of intentional malice. *Cf. Goldsmith*, 513 F.3d at 1283 ("Goldsmith suffered both economic harm and emotional and psychological harm. Goldsmith's relationships with his family suffered, he attended counseling after his termination, and his termination made him feel 'hurt' and 'upset' . . . . The record also establishes that Goldsmith was financially vulnerable and had to borrow money after he was terminated.").

The court is mindful that "[e]vidence tending to prove a company policy or practice of discrimination can support a sizeable punitive damages award." *Id.* (citing *Gore*, 517 U.S. at 615). Sizeable awards are also appropriate in cases where the compensatory damages are "relatively small and there [is] a substantial need for deterrence," or "where the defendant's conduct was exceedingly reprehensible." *Id.* at 1284 (upholding an award of $500,000 in punitive damages where the award of compensatory damages was $54,321). The court notes that a number of facts in this case demonstrate that the discriminatory conduct was exceedingly reprehensible, highly malicious, and directed toward a person who was known to be very vulnerable. Particularly reprehensible is Prickett's deliberate continuation of the discriminatory conduct after she knew she was causing Dismukes great anguish and harming Dismukes's ability to provide for her children.

Further, the illegal conduct that Dismukes endured in this case was caused by aggressive enforcement of a stated, long-standing, overt company policy of racial discrimination. Therefore, the court finds that it especially necessary in this case to impose

an award of punitive damages that is significant enough to deter future discriminatory conduct by these Defendants. *Cf. Goldsmith* 513 F.3d at 1284 (noting the value of high ratios of punitive damages to compensatory damages where necessary to deter future illegal discrimination).

Accordingly, having considered the governing law and the facts of this case, the court concludes that the conduct of the Defendants supports an award of punitive damages in the amount of $175,000.00.

## Attorneys' Fees and Costs

Attorney's fees may be awarded to a plaintiff who prevails in a § 1981 action such as this one. *See* 42 U.S.C. § 1988(b). As the prevailing party, Dismukes seeks an award of $2,590.00 in attorney's fees, which represents 12.95 hours of work by a licensed attorney at a rate of $200.00 per hour. Having considered the billing records and the other evidence submitted by Dismukes (Doc. 35), the court concludes that the requested attorney's fee represents a reasonable rate that is in line with market rates for similar services by lawyers of reasonably comparable skills, experience, and reputation. *See Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1299 (1988) ("A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation."). Further, the court concludes that Dismukes's attorney expended a reasonable number of hours on this case. *See id*. (explaining the method for calculating an award of attorneys' fees). Therefore, the court finds that Dismukes is entitled

to an award of attorney's fees in the amount of $2,590.00.

Dismukes seeks an award of court costs, which are normally assessed against the losing party. *See* 42 U.S.C.A. § 1988(b). The court finds that Dismukes is entitled to an award of costs, and, therefore, costs will be taxed against Defendants Robyn Prickett and J&R Entertainment.

## CONCLUSION

Accordingly, it is

**ORDERED** that the motion for attorney fees filed by the Plaintiff, Kandas Dismukes (Doc. 35), be and is hereby **GRANTED.** Further, it is

**ORDERED** that Dismukes's motion for compensatory and punitive damages (Doc. 36) be and is hereby **GRANTED**. Further, it is

**ORDERED** that Defendants Robyn Prickett and J&R Entertainment are liable to the Plaintiff, Kandas Dismukes, for the following sums:

1. $35,000.00 in compensatory damages;
2. $175,000.00 in punitive damages; and
3. $2,590.00 in attorney's fees, plus costs.

A separate final judgment will be entered.

Done this 19th day of October, 2012.

/s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE